# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-243


**STATE IN THE INTEREST OF L.W., J.W. & L.W.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. J-2125
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE


**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Jimmie C. Peters, Judges.


**AFFIRMED.**

**Robert J. Elliott**
**Department of Social Services**
**P. O. Box 832**
**Alexandria, LA 71309-0832**
**Telephone: (318) 487-5227**
**COUNSEL FOR:**
    **Appellee - State of Louisiana, Department of Social Services**

**Robert L. Kennedy**
**352 2nd Street**
**Colfax, LA 71417**
**Telephone: (318) 627-3255**
**COUNSEL FOR:**
    **Appellees - J.W., L.W., and L.W.**

**James F. Slaughter**
**403 Second Street**
**Colfax, LA 71417**
**Telephone: (318) 627-2240**
**COUNSEL FOR:**
    **Appellant - J.M.W.**

**James Patrick Lemoine**
**District Attorney, 35th Judicial District Court**
**Renee W. Dugas**
**Assistant District Attorney, 35th Judicial District Court**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**Telephone:  (318) 627-3205**
**COUNSEL FOR:**
     **Appellee - State of Louisiana**

**Joseph P. Beck, III**
**5527 Monroe Highway**
**Ball, LA 71405**
**Telephone:  (318) 640-9202**
**COUNSEL FOR:**
     **Appellant - A.W.R.**

**THIBODEAUX, Chief Judge.**

Defendants-appellants, A.W.R. and J.M.W., appeal the trial court judgment that terminated their parental rights to their three minor children and certified the children for adoption. Defendants allege the judgment should be reversed because the plaintiff-appellee, State of Louisiana, Department of Social Services (DSS), failed to prove by clear and convincing evidence the grounds for termination as set forth in La.Ch.Code arts. 1015(4)(b) and (5). Defendants also allege the trial court erred in accepting psychologist, David G. Adkins, Ph.D., as an expert witness qualified to offer opinions regarding termination in this case since he only interviewed the defendants once and his examination methodologies were unreliable.

We affirm.

## I.

## ISSUES

1.  Did the trial court err in accepting David G. Adkins, Ph.D., as an expert qualified to offer an opinion in this case?

2.  Did the DSS prove by clear and convincing evidence the parents' failure to provide significant contributions of care and support to the children for at least six consecutive months as required by La.Ch.Code art. 1015(4)(b)?

3.  Did the DSS prove by clear and convincing evidence the grounds for termination set forth in La.Ch.Code art. 1015(5), which include: (a) the children being in DSS custody for a period of one year; (b) no substantial parental compliance with the case plans for services; and (c) no reasonable expectation of significant improvement in the parents' conditions or conduct in the near future?

## FACTUAL BACKGROUND

The DSS confirmed a report of neglect, drug dependency, and inadequate housing on July 12, 2007, when they responded to a complaint alleging the defendants' three minor children (who were then ages one, five, and six) were unexpectedly left for three days in the care of their aunt by their mother, A.W.R., who could not be located. The mother left under the false pretense of going to the store for diapers and failed to return. The children were left with only the clothes they were wearing. It was also reported that it was not A.W.R.'s first time leaving her children unexpectedly for an extended period of time. The case worker was advised that A.W.R. had left her children with another acquaintance for two days, during which time she could not be contacted.

The children's father, J.M.W., was incarcerated at the time the report was made to DSS. Consequently, the aunt placed the children with their paternal grandmother, but the DSS case worker investigating the complaint found the grandmother's home unsuitable for the young children. The home lacked sufficient food, was without electricity, had little or no furniture, and was in a physical state deemed unsafe for the children's ages.

The case worker's investigation also revealed the defendants' inadequate housing situation and their possible drug abuse problems. The home the defendants lived in with their children was a small, one-bedroom house. There was no running water in the home at the time of the investigation, and there was a lack of adequate space or beds for the three children. The mother's and father's drug abuse became a concern during the investigation when the DSS social worker investigating the case stated that multiple "collaterals" voiced concerns of illicit drug abuse by both of the

defendants. In addition, a former babysitter for the children reported having witnessed the five-year-old child mimic drug use by placing a straw in his nose and attempting to sniff baby powder. The mother's drug abuse was confirmed in July, shortly after the investigation had begun, when she consented to a drug test, which returned with positive results for opiate use.

On September 26, 2008, DSS filed a Petition for Termination of Parental Rights and Certification of Minor Children for Adoption, alleging termination was justified due to the parents' failure, during the year their children had been in State custody, to substantially comply with the case plans for services that sought to reunify the family. It was further alleged that neither of the defendants had contributed any significant contributions to the care and support of the children during the children's entire time in State custody. DSS asserted there was no reasonable expectation of significant improvement in the near future in the behaviors, conditions, or conduct of the defendants.

The trial on termination of the parental rights of the defendants was heard on November 12, 2008, approximately one year and four months after the children were placed in State custody. After testimony was provided, the trial court granted the termination. The mother and father have both appealed the judgment.

_____III.

## LAW AND DISCUSSION

### *Dr. Adkins as an Expert Witness*

The defendants argue that Dr. David Adkins, the clinical psychologist who evaluated the defendants as a requirement of the case plans for reunification of the family, was erroneously allowed to testify as an expert about their suitability for regaining custody of, and parenting, their children. Their arguments do not challenge

3

Dr. Adkins' qualifications as an expert in the field of clinical psychology. The opposition to his testimony is based on his limited interaction with the defendants and challenges to the reliability of the data he obtained through his testing of the defendants.

During Dr. Adkins' April 22, 2008, evaluation of the defendants, he reviewed their social histories, which had been obtained by a member of his staff, and performed a clinical interview with each defendant. He also conducted some psychological testing, which consisted of a "brief" intelligence test, as requested by DSS; a parenting inventory; and a personality assessment inventory, which was administered to the mother, A.W.R., only. According to Dr. Adkins, it was determined that the father, J.M.W., had a learning disability and was unable to read and understand the personality assessment inventory. Consequently, he did not complete this portion of the evaluation.

Based on the results obtained, Dr. Adkins opined that the defendants both exhibited factors that led him to believe the children were at substantial risk for maltreatment in their home and should not be in the custody or care of their parents under the circumstances. He testified at trial that his primary concerns were the lack of stable housing and income for the family and drug abuse by the defendants. He advised the court that he had no new information about the defendants' status in these regards, but stated if they had shown no improvement during the six months since his April 2008 evaluation, he would continue to recommend that the children not be returned to the care of their parents.

Dr. Adkins based his conclusions on specific findings drawn from his conversations with the defendants and their test results. He testified that the mother, A.W.R., had an average I.Q. but exhibited signs of a double depression, consisting

4

of dysthymia (mild but ongoing, chronic depression) overlaid with a major depressive episode (acute but shorter term depression). Moreover, he stated that A.W.R. presented signs of post-traumatic stress syndrome, possibly related to alleged multiple episodes of childhood abuse she reportedly suffered. He recognized passive-aggressive personality traits in her and stated that she scored extremely poorly (16th percentile) on the scale measuring her ability to relate with empathy to children. He explained that this means a child's value and importance is less to the parent than is normal and that she has problems helping children or finding ways to meet their needs. He added that the normal developmental demands of children typically seem bothersome to persons with low empathy scores such as A.W.R.'s. Also, he diagnosed poly-substance abuse in partial remission. Dr. Adkins explained that the partial remission portion of the diagnosis was based on A.W.R.'s admission to him of her history of drug use and her claims to have stopped using many of those drugs taken in her past. Prior to any attempts to reinstate custody to A.W.R., Dr. Adkins recommended clinical mental health treatment for the depression; in-house rehabilitation for the apparent drug-dependency; and, that A.W.R. obtain employment and complete a parenting program.

According to Dr. Adkins, the father, J.M.W., exhibited characteristics of an adjustment disorder with depressed mood, a learning disability for which further testing was needed, and anti-social personality tendencies, manifested as "trouble with authorities," a "headstrong" attitude, and non-conformist behaviors. Dr. Adkins also made a provisional diagnosis of poly-substance abuse in partial remission. He labeled the drug abuse as provisional because J.M.W. stated he took opiates to treat residual pain from past hip and/or back injuries. These injuries were verified. Dr. Adkins did not have information to verify if the narcotics were necessary to treat

residual pain or were being used excessively. Dr. Adkins recommended further evaluation of this drug use by a medical doctor. He further recommended that to address these concerns, J.M.W. should be required to submit to random drug tests, complete a parenting program, and maintain employment or seek disability assistance through the Social Security Administration (if his physical condition necessitated this).

Both defendants cite Louisiana Code of Evidence Article 702, regarding testimony by experts, in support of their argument:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The defendants contend Dr. Adkins' testimony should not have been relied upon in this case because he did not spend sufficient time with them to gain accurate or reliable information about their abilities to serve as suitable parents. Moreover, they argue the data upon which he based his opinions—test scores from the parental and personality assessments—were not established as being accurate. Finally, they assert that during the formulation of the opinions Dr. Adkins rendered at the trial, he failed to consider any changes in the defendants' circumstances that may have occurred during the six months that had passed since his assessment of them.

This court has recognized "the qualification of an expert witness rests within the sound discretion of the trial court, and its determination will not be disturbed on appeal except upon a showing of manifest error." *Succession of Launius*, 503 So.2d 682, 683 (La.App. 3 Cir. 1987) (citing *Richardson v. Continental Ins. Co.*, 468 So.2d 675, (La.App. 3 Cir. 1985), *writ denied*, 474 So.2d 1304 (La.1985)). "The weight to be accorded to the testimony of experts depends largely

on their qualifications and the facts on which they base their opinions." *Oliver v. Oliver*, 95-1026, p. 19 (La.App. 3 Cir. 3/27/96), 671 So.2d 1081, 1092 (quoting *Durkee v. City of Shreveport*, 587 So.2d 722, 728 (La.App. 2 Cir.), *writ denied*, 590 So.2d 68 (La.1991)). Consequently, expert testimony is to be weighed in the same manner as any other evidence presented at trial. *Lanasa v. Harrison*, 02-26 (La.App. 4 Cir. 8/7/02), 828 So.2d 605, *writ denied*, 02-2512 (La. 11/27/02), 831 So.2d 286. That is, the trial court may exercise its broad discretion and accept or reject, in whole or in part, an expert's testimony. *Id.* The court of appeal is not to disturb the trial court's actions in this regard unless it determines the trial court has committed an abuse of discretion. *Id*.

While on the witness stand, Dr. Adkins was questioned about the thoroughness and reliability of his evaluations of the defendants. He rejected the notion that the period of the evaluation was too short or that the information elicited could not accurately be relied upon. He testified that the length of the evaluations of the defendants was slightly longer than is typical. In addition, he stated that the evaluation of the defendants was conducted according to the standard procedure he used in performing an average of 250 to 300 such parental evaluations per year. According to Dr. Adkins, the tests administered, in addition to the social histories and interviews conducted, are clinical standards used in his field of clinical psychology to formulate opinions about the persons being interviewed.

Dr. Adkins further explained that he earned his Ph.D. in clinical psychology in 1996 and had been licensed in Texas since then. He became a Louisiana licensed clinical psychologist in 2003. He attested to being qualified as an expert in the field of clinical psychology in various courts approximately two to three times per month, on average, in his capacity as a medical consultant performing

disability determinations and also due to his regular performance of parental evaluations for DSS' Office of Community Services.

Accordingly, we find no merit to the defendants' argument that the trial court abused its discretion by allowing Dr. Adkins to provide expert testimony in this case. Considering Dr. Adkins' experience and qualifications, he clearly possesses an expertise in providing assessments in cases involving parental fitness. He testified that the tests used by him to obtain the personality and parenting information on which he relied in formulating his opinions were routinely used and accepted as clinically standardized methods in his field of clinical psychology. This testimony was not refuted. Further, he adequately qualified his testimony regarding the defendants, stating that his opinion was based on the information provided to him during his April assessment of the defendants and revealing that he did not have any knowledge of any changed circumstances since then. The trial court did not indicate in its oral ruling what, if any, weight it gave to the testimony offered by Dr. Adkins and we cannot speculate as to this factor. Regardless, the trial court possessed the discretion to consider this information, and we find no abuse of the trial court's discretion to allow Dr. Adkins to offer this testimony for the court's consideration.

### *Termination of Parental Rights*

Before a court can involuntarily terminate an individual's rights and privileges as a parent, the State must establish at least one of the statutory grounds set forth in La.Ch.Code art. 1015 by clear and convincing evidence. *State ex rel. A.T.*, 06-501 (La. 7/6/06), 936 So.2d 79. An appellate court cannot set aside the trial court's findings of fact unless the trial court's findings are manifestly erroneous. *Id*. (citations omitted).

8

During the trial in this case, the State sought to establish that the defendants satisfied the grounds that would allow for involuntary termination of their parental rights pursuant to La.Ch.Code arts. 1015(4)(b) and (5). Those sections state:

The grounds for termination of parental rights are:

. . . .

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

. . . .

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The defendants contend the State did not establish by clear and convincing evidence the grounds of La.Ch.Code art. 1015(4)(b)—the parents' failure to provide significant care for the children for six consecutive months. We disagree.

The record reflects unrefuted proof that during the more than one-year period of the State's custody of the children, neither defendant ever provided any assistance, monetary or otherwise, for the care of the children as they remained in

foster care. Consequently, we find that the grounds for termination set forth in La.Ch.Code art. 1015(4)(b) were established by clear and convincing evidence.

The State also established that involuntary termination of the defendants' parental rights was warranted pursuant to La.Ch.Code art. 1015(5). Article 1015(5) states that each of the following be established: (1) at least one year has elapsed since the children entered State custody; (2) there is *no substantial parental compliance* with the case plan for services; (3) and there is *no reasonable expectation of significant improvement* in the parent's condition or conduct in the near future. The first element of Article 1015(5) is clearly established based on facts in the record revealing that the children were in State custody for more than one year when the termination trial was held and the judgment granting the involuntary termination was rendered.

The second element—requiring clear and convincing evidence of the lack of "substantial parental compliance" with the family's case plan—is established in the record as well. According to La.Ch.Code art. 1036(C), the lack of parental compliance with a case plan can be proven by showing one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

In this case, multiple instances of the defendants' failure to comply with these conditions, which were all a part of the case plan for reunification of the family, exist.

Specifically, the case plan required the parents to do the following: participate in substance abuse evaluations, which includes providing honest information regarding drug abuse history and following any recommendations as a result of the evaluations; submit to random drug testing; participate in psychological evaluations and follow resulting recommendations, which were included in the case plan (seek mental health and medical follow-up examinations, complete parenting classes, and maintain a stable income and home environment); exhibit ability to maintain adequate housing and food in the home for a minimum period of six months; demonstrate the ability to maintain a stable income sufficient to care for the children; visit regularly with the children according to the agreed-upon schedule; and, notify DSS of any changes in address, telephone number, employment, and household composition.

The record reflects the unrefuted evidence of both defendants' failure to complete any of these requirements. Neither defendant fully completed substance abuse evaluations and treatment. A.W.R. completed ten days of a detoxification program, but did not complete the recommended in-house substance abuse treatment program that followed. In addition, she, thereafter, tested positive on a few other occasions for opiate use. J.M.W. did not submit to a substance abuse evaluation, but he contends the evaluation was unnecessary because it was never established that he abused drugs. All of his tests resulted in negative results. However, the record

11

contains J.M.W.'s admission to having taken illegally obtained narcotics, such as Lortab and Vicodin, albeit to treat allegedly legitimate pain even after the children were in State custody. In addition, according to the testimony of case worker, Chris Koehler, the drug testing that J.M.W. submitted to that resulted in the negative results, did not constitute random testing. Koehler testified that both defendants refused requests for drug tests on multiple occasions and would submit themselves for testing at later times of their own choosing.

The record further establishes that the defendants were both incarcerated on multiple occasions during the more than one year period the children were in State custody prior to the termination hearing, and they never maintained a stable address for a minimum of six months. The defendants lived at different locations, with multiple relatives, for various periods during the time the case plans seeking reunification of the family were in effect. According to the case worker, Koehler, often these relatives would not have knowledge of the defendants' whereabouts when contacted. Moreover, the defendants never kept DSS regularly apprised of their changing addresses or other contact information.

The defendants never provided verifiable proof of incomes that were stable and suitable to provide the necessary care for their three children. A.W.R. did not obtain any employment during the children's tenure in State custody. J.M.W. testified at trial that he historically worked at random jobs, when not incarcerated, to obtain income and testified that he was employed at the time of trial. However, he did not offer any testimony of the amount of his income or how long he could expect to be employed.

We find that all of these failures to comply with the statutorily defined measures of compliance, constitute a lack of "substantial" parental compliance with the case plan.

Finally, the record supports a finding, by clear and convincing evidence, of a "lack of a reasonable expectation of significant improvement" in the defendants' conduct or conditions in the near future. Louisiana Children's Code Article 1036(D) explains that this component of La.Ch.Code art. 1015(5) may be established by proof of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The State's expert, Dr. Adkins, provided his unrefuted opinion that the children were at risk for harm based on the mother's, and possibly father's, drug abuse problems. Moreover, both parties were revealed to be unreliable sources of stability for the children, based on their repeated episodes of abandonment and incarceration for criminal activity. In addition, the parents' pattern of conduct revealed either an inability or unwillingness to establish a stable home environment and income suitable for the care of three children. Accordingly, we find that the grounds for termination of parental rights pursuant to La.Ch.Code art. 1015(5) were established by clear and convincing evidence set forth in the record.

13

IV.

**CONCLUSION**

The judgment of the trial court, involuntarily terminating the parental rights of A.W.R. and J.M.W. to their three children, J.M.W., Jr., L.W., and L.W., is affirmed. All costs are assessed to A.W.R. and J.M.W.

**AFFIRMED.**