# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-1570

**STATE IN THE INTEREST OF I.D.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 2008 JU 12
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Annette Fuller Roach**
**15th JDC Public Defenders Office**
**Post Office Box 1747**
**Lake Charles,  LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
      **C.D.**

**Diane E. Cote**
**825 Kaliste Saloom Road**
**Brandywine I, Room 218**
**Lafayette, LA  70508**
**(337) 262-5913**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana, Department of Social Services**

**Nicole M. Guidry**
**Two South Magdalen Square**
**Abbeville, LA  70510**
**(337) 740-8885**
**COUNSEL FOR APPELLEE:**
      **I.D.**

**AMY, Judge.**

The State filed a petition seeking to terminate C.D. and J.J.'s parental rights as to their daughter, I.D.[1] At the hearing, J.J. stipulated to the termination of her parental rights. After hearing the evidence, the trial court ordered that C.D.'s parental rights as to I.D. be terminated. C.D. appeals. For the following reasons, we affirm.

## Factual and Procedural Background

According to the record, I.D. was born in 2003 and, at one point, was placed in her grandmother's custody. In 2008, the State of Louisiana, Department of Children and Family Services received a report that I.D. was being physically abused and removed her from her grandmother's care. Her father, C.D., was incarcerated at that time.

In February of 2008, I.D. was determined to be a child in need of care and placed with foster parents. The State initially attempted to reunify I.D. with both C.D. and her mother, J.J. However, in April of 2010, the State filed a petition seeking termination of both C.D. and J.J.'s parental rights as to I.D. According to the trial court's minutes, the termination hearing was rescheduled several times, in part to allow C.D. and J.J. more time to work on their case plans. Eventually, the termination hearing was held on October 24, 2011. At the hearing, J.J. stipulated to the termination of her parental rights, stating that I.D.'s foster parents are wonderful people and that she did not want to take away the stability I.D. had in her life. Therefore, the majority of the hearing focused on C.D.

Contending that C.D. had failed to substantially comply with his case plan, the State introduced evidence to the effect that C.D. had been incarcerated, for various reasons, for twenty-nine of the forty-five months prior to the hearing and was

---

[1] The initials of the child and her parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

incarcerated at the time of the hearing. The State also introduced evidence that, even when not incarcerated, C.D. failed to meet several other requirements of his case plan, including failing to attend AA/NA meetings, failing to pay for the cost of foster care, failing to provide verification of employment, and failing to provide a housing environment free from drugs, alcohol, and persons who had committed felonies. C.D. contended that he had substantially complied with his case plan. C.D. testified that he had been gainfully employed during the periods that he was not incarcerated, that he paid $50.00 per month towards child support and child support arrearages, that his drug screens were "always negative," and that he had obtained adequate housing. Further, C.D. acknowledged that his case plan required him to attend AA/NA meetings. According to C.D.'s testimony, he went to those meetings when he was incarcerated, and "partial[ly]" when he was not. C.D. also testified that he attended anger management meetings.

After receiving all of the evidence, the trial court issued both written and oral reasons for judgment. The trial court found that there had been no substantial compliance of the case plan by C.D. and that there was no reasonable expectation of significant improvement in his condition or conduct in the near future. As part of this finding, the trial court cited C.D.'s "rather infrequent" and "haphazard" visitation with I.D. and his failure to contribute towards the costs of foster care. The trial court was particularly concerned about C.D.'s drug abuse problems and his "pattern of incarceration," stating:

> It's clear to me that one of the main conditions that caused this whole problem was drug use and drug abuse and the consequences of that abuse, including anger and violence.
>
> And it's clear [C.D.], although not convicted, the minute he gets out of jail for that offense that he has committed now and is serving time, he's facing an additional drug charge. The fact that he could not successfully complete probation and is incarcerated as a result of not completing his probationary period successfully is a sign that he has

2

difficulty, is unable to get himself right for -- even to stay out of jail, much less take care of a child.

The record indicates that the trial court interviewed I.D. in chambers about her preferences. The trial court noted that I.D. was happy and thriving with her foster parents and that I.D. had stated that she wanted to remain with them. The trial court also observed that I.D. did not want to live with C.D. or spend any time with him outside of a supervised situation. Accordingly, the trial court ordered that C.D.'s parental rights as to I.D. be terminated.

C.D. appeals, asserting that:

> I. The trial court erred in terminating the parental rights of C.D. as the State failed to prove by clear and convincing evidence that C.D. had failed to substantially comply with the case plan. The State also failed to establish that C.D.'s incarceration was of such duration that he would be unable to care for the child for an extended period of time or that there was no reasonable expectation that C.D. would substantially comply with the case plan, as deemed necessary for the safe return of the child, upon his release from incarceration.

> II. The trial court erred in considering whether termination was in the best interests of the child.

### Discussion

*Insufficiency of the Evidence*

In C.D.'s first assignment of error, he contends that the State failed to prove by clear and convincing evidence that he did not substantially comply with his case plan. Further, C.D. contends that the trial court erred in finding that his incarceration was of such duration that he was unable to care for I.D. for an extended period of time.

The supreme court discussed termination of parental rights cases in *State in the Interest of J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806, 810-11, stating:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d

640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98–0922 (La. 10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M.*, 719 So.2d at 452; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La.App. 4 Cir. 1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir. 1982).

The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. La. Child. Code art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d at 185.

Title X of the Children's Code governs the involuntary termination of parental rights. La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code art. 1039. *See State in Interest of ML & PL*, 95-0045 (La. 9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Child. Code art. 1035(A); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

Thus, the State has to prove one of the statutory grounds for termination of parental rights by clear and convincing evidence. In this case, the trial court cited La.Ch.Code art. 1015(5) and (6) as grounds for termination. Those provisions state:

> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

> (6) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child's age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.

The manifest error standard of review is applicable to involuntary termination of parental rights cases. *State in the Interest of K.G. & T.G.*, 02-2886, 02-2892 (La. 3/18/03), 841 So.2d 759.

Louisiana Children's Code Article 1036(C) provides a list of factors which may evidence a lack of parental compliance with a case plan. It states:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.

> (2) The parent's failure to communicate with the child.

> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

5

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

"A trial court's factual determinations as to whether there has been substantial compliance with a case plan, whether a significant indication of reformation has been shown, and whether the parent is likely to reform will not be set aside unless the record reflects that the trial court was clearly wrong." *State in the Interest of G.O.*, 10-571, pp. 5-6 (La.App. 3 Cir. 6/8/11), 68 So.3d 636, 640, *writ denied*, 11-1512 (La. 7/21/11), 67 So.3d 479.

The trial court found that C.D. failed to comply with several of the statutory factors contained within La.Ch.Code art. 1036(C). Specifically, the trial court found that C.D.'s visitation with I.D. was "haphazard" and "rather infrequent." Regarding his assertion that the State failed to prove that he had not substantially complied with his case plan, C.D. contends that, because the State did not allege that he had failed to pay or had underpaid his child support obligations, the trial court should not have considered any allegations to that effect. At the hearing, C.D. testified that he was paying $50.00 per month in child support and was approximately $6,000.00 in arrears when he was released from one of his periods of incarceration. According to C.D., these payments were for child support for I.D. for when she was with her grandmother and when he was incarcerated. The caseworker, Stacey Mire, testified that C.D. had not contributed to the cost of I.D.'s foster care. Given this testimony, the trial court was able to distinguish C.D.'s payment of child support arrearages and his non-payment towards the costs of foster care.

6

Further, C.D. asserts that he visited I.D. regularly and that the trial court erred in finding that his visitation was "haphazard" and "rather infrequent." According to C.D.'s testimony, he did not visit with I.D. when he was incarcerated because "they wouldn't let her," but he had sent her two letters. We particularly note that C.D. conceded that he had been incarcerated for at least twenty-nine of the forty-five months preceding the hearing. Additionally, Ms. Mire testified that when C.D. visited with I.D., "[h]e had a hard time engaging [I.D.] after about 15 minutes. He would stay on his cell phone a lot, or he would call people and let her talk to them instead of using the hour for him and [I.D.]"

C.D. further contends that he substantially complied with the requirement that he attend AA/NA. C.D. contends that he attended AA/NA while he was incarcerated, as well as other substance abuse classes. According to C.D.'s testimony, when he was not incarcerated, he "only partially" attended AA/NA. C.D. claimed that his parole officer told him that he did not have to attend AA/NA as long as he was passing his drug screens. However, Brian Kelly, C.D.'s first caseworker, testified that C.D. did not follow through with the AA/NA classes and that C.D. failed to get a sponsor, either in or out of jail.

We further observe that C.D.'s case plan required him to complete parenting classes and go to counseling. Mr. Kelly testified that C.D. was late to the first parenting class and did not attend the other four classes. Additionally, according to Mr. Kelly, C.D. was inconsistent in his visits with the counselor. To his credit, C.D. testified that he completed an anger management class and submitted a certificate to that effect. Notably, Ms. Mire testified that, after he was arrested for suspicion of DUI, C.D. admitted to using synthetic marijuana. The trial court found that C.D.'s problems with drug use and drug abuse constituted "repeated failure to comply with the required program of treatment and rehabilitation services provided in the case

7

plan" as well as "lack of substantial improvement in redressing the problems preventing reunification" and "the persistence of conditions that led to removal or similar potentially harmful conditions."

Given this evidence, we find that the trial court did not err in determining that the State met its burden of proof with regard to showing a lack of parental compliance with the case plan.

C.D. also asserts that the trial court erred in considering his incarceration as grounds for termination. C.D. specifically contends that the State failed to prove that his incarceration was of such duration that he would be unable to care for the child for an extended period of time, as contemplated by La.Ch.Code art. 1015(6). However, although Article 1015(6) was cited by the trial court in his reasons for judgment, in discussing C.D.'s incarceration, the trial court also cited La.Ch.Code art. 1036(D), which concerns the evidence of the "lack of any reasonable expectation of significant improvement in the parent's conduct in the near future." That article states, in relevant part:

> Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> . . . .
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

Contrary to C.D.'s assertion concerning the duration of his incarceration, the trial court found that C.D.'s incarceration constituted "a pattern of repeated incarceration" such that C.D. would be unable to care for I.D. for extended periods of time. On this issue, the trial court stated:

> Clearly that has been shown in the case. Something like more than half of the time since the child has been removed [C.D.] has been incarcerated, and not just on one incarceration, but over and over again,

8

periods of incarceration, and he may be facing another one at this point. He was incarcerated at the time . . . the child was removed the first time. He got out. The child was with him for a period of time. He could not improve. He's been in and out of jail ever since.

C.D. conceded that he had been incarcerated for approximately twenty-nine of the forty-five months preceding the termination hearing. Particularly, the record indicates that C.D. was incarcerated when I.D. was initially taken into the State's custody and that he was incarcerated when the termination hearing was held. Ms. Mire testified that C.D. was arrested on suspicion of DUI in November of 2010. As a result of that arrest, C.D.'s probation was revoked and he was ordered into an intensive drug program in Concordia Parish until April 1, 2011. Ms. Mire also noted that C.D. was arrested in April of 2011 for simple battery or domestic abuse of an ex-girlfriend. Further, according to Ms. Mire's testimony, C.D. was arrested for possession of hydrocodone in June of 2011 and his probation was again revoked. C.D. testified that he was incarcerated for violating his probation by using prescription medication.

At the time of the termination hearing, C.D. had not been convicted on those pending charges. However, the new charges resulted in the revocation of his probation and his subsequent incarceration. Accordingly, we find no error in the trial court's determination that C.D.'s pattern of repeated incarceration was such that there was a "lack of any reasonable expectation of significant improvement in the parent's conduct in the near future." La.Ch.Code art. 1036(D). *See State in the Interest of B.B.*, 11-252 (La.App. 3 Cir. 6/8/11), 67 So.3d 1268, *writ denied*, 11-1812 (La. 8/31/11), 68 So.3d 517; *State in the Interest of L.W.*, 09-243 (La.App. 3 Cir. 6/3/09), 11 So.3d 1225.

This assignment of error is without merit.

*Best Interests of the Child*

In his final assignment of error, C.D. contends that, because the State failed to prove by clear and convincing evidence one of the statutory grounds for termination, the trial court erred in considering whether the termination of parental rights was in I.D.'s best interests.

In addition to finding that the State has proven a ground for termination of parental rights by clear and convincing evidence, the trial court must also find that the termination is in the best interests of the child. *State in the Interest of J.A.*, 752 So.2d 806. C.D.'s assignment of error presupposes that the trial court erred in finding that the State met its burden of proof with regard to the statutory grounds for termination. As discussed, we have determined that the trial court did not err in finding that the State proved by clear and convincing evidence at least one of the statutory grounds for termination of parental rights. Therefore, C.D.'s argument in this regard must fail.

Further, we find no error in the trial court's determination that the termination of parental rights was in I.D.'s best interests. In discussing the statutory grounds for termination, the trial court noted that "[i]t's clear to me that one of the main conditions that caused this problem was drug use and drug abuse and the consequences of that abuse, including anger and violence." The trial court believed that C.D. had not been able to change this pattern of behavior. The record also indicates that the trial court interviewed I.D. in chambers. In his written reasons for judgment, the trial court stated that I.D. is "happy in her current placement and well-adjusted." In his oral reasons for judgment, the trial court also stated that I.D. called her current caretakers "Mom" and "Dad" and that she wanted to be adopted. Further, the trial court explained that I.D. did not want to return to a home inhabited by C.D., nor did she want to have unsupervised visitation with C.D. The trial court also stated that he was convinced that there would be a serious risk involved if there were any

chance of I.D. returning home with C.D. We also observe that I.D. was adjudicated a child in need of care in February 2008. At the time of the termination hearing, she had been in the State's custody for more than three years.

In light of the evidence concerning C.D.'s long-standing drug abuse problems and his pattern of incarceration, as well as I.D.'s attachment to her caretakers, we find no error in the trial court's consideration of this issue and in the trial court's finding that termination of C.D.'s parental rights would be in I.D.'s best interests. This assignment of error is without merit.

## DECREE

For the foregoing reasons, judgment of the trial court terminating C.D.'s parental rights as to I.D. is affirmed in its entirety. Costs of this proceeding are cast to the appellant, C.D.

**AFFIRMED.**